[No. 4206–5–III. Division Three. January 5, 1982.]

LLOYD K. HARDING, ET AL, *Appellants,* v. WALLACE
E. WARREN, ET AL, *Respondents.*

R. *Maurice Cooper* and *Cooper & Roberts,* for appellants.

*Richard F. Monahan* and *Roach, Votendahl & Monahan,* for respondents.

Roe, A.C.J.—Defendants signed an agreement listing their farm with plaintiff real estate broker. He sues for his commission.

He obtained an offer from Reavis reciting a 29 percent down payment and a 7 percent interest rate on the contract balance. The disposition of this case depends upon whether the following words appearing in the listing agreement are, as claimed by the defendants, ambiguous as to the rate of interest this contractual balance would bear:

We interpret it to read as follows:

| | | | ballon [*sic*] |
|---|---|---|---|
| Price $580,000.00 | Down 29% | Balance <u>20 year amoritized</u> [*sic*] with 10 year pyt | Incumbrance <u>Lovey</u> Due <u>$127,000[?]</u> |
| <u>7%</u> at <u>$17,925,</u> | Interest _____ | Included <u>7%</u>, | |

The trial court decided the instrument was ambiguous and then admitted parol evidence from the defendant sellers that they believed the interest rate to be negotiable, even though the agreement says naught that interest is to be negotiable. The broker produced evidence the interest rate was not considered negotiable, that 7 percent was agreed upon, and also that the owners refused to negotiate. The trial court believed the sellers' version.

Plaintiff strenuously contends the trial court erred in finding an ambiguity existed. He testified that since the space in the listing agreement which provided for the contract balance terms was not wide or long enough to include all of the terms, the words "ballon [ *sic*]" and "7%" were respectively placed above and below the line provided for

the balance, thus reading "20 year amoritized [*sic*] with 10 year ballon [*sic*] payment 7%". Mrs. Warren testified the interest rate was to be negotiable because they believed the bank rate was going up, and that she inquired of Harding why "7%" was inserted two times on the line beginning with "Incumbrance" and was told it referred to the encumbrance or underlying contract. The trial court found that reading the listing agreement in the normal fashion from left to right would lead one to the belief that both 7 percent figures on the "Incumbrance" line referred to the underlying encumbrance which actually did bear 7 percent interest.

█ It is the court's function to determine from a document whether it is ambiguous or incomplete. *Gwinn v. Cleaver*, 56 Wn.2d 612, 354 P.2d 913 (1960); *Washington Fish & Oyster Co. v. G.P. Halferty & Co.*, 44 Wn.2d 646, 269 P.2d 806 (1954). A written instrument is ambiguous when its terms are uncertain or susceptible to more than one meaning. *Ladum v. Utility Cartage, Inc.*, 68 Wn.2d 109, 411 P.2d 868 (1966); *Cherberg v. Peoples Nat'l Bank*, 15 Wn. App. 336, 341, 549 P.2d 46 (1976), *rev'd on other grounds*, 88 Wn.2d 595, 564 P.2d 1137 (1977). The purpose of allowing parol evidence is to explain ambiguities in an instrument after the rules of construction have been first used to resolve them; extrinsic evidence is not properly used to vary or modify the written instrument. *Fuller Mkt. Basket, Inc. v. Gillingham & Jones, Inc.*, 14 Wn. App. 128, 539 P.2d 868 (1975). Parol evidence may always be used to explain ambiguities in written instruments and to ascertain the intent of the parties. *Levy v. North Am. Co. for Life & Health Ins.*, 90 Wn.2d 846, 586 P.2d 845 (1978); *Corinthian Corp. v. White & Bollard, Inc.*, 74 Wn.2d 50, 442 P.2d 950 (1968).

Here, the contract failed to specify exactly to what the 7 percent was related. It could have been interpreted in at least three ways: (1) 7 percent included as part of the encumbrance, (2) 7 percent on the unpaid balance, or (3) a very strained suggestion by respondent that 7 percent was "included" in the sale price. Since the term 7 percent was

not specifically connected to the terms referring to the balance, the trial court could reasonably conclude the meaning of 7 percent after "Included" on the encumbrance line was ambiguous. We cannot find the trial court erred in finding the contract ambiguous and admitting parol evidence.

Harding's next contention is that the trial court failed to give sufficient weight to his testimony, circumstantial evidence and testimony of third parties which indicated Harding believed the interest rate on the unpaid balance to be 7 percent. Thus, he claims the evidence preponderates against the trial court's interpretation of the listing agreement, citing *Brooks v. Warner,* 50 Wn.2d 99, 102, 309 P.2d 757 (1957), which held a trial court's findings of fact will not be upheld when the evidence preponderates against it.

■ The correct test to be applied, however, is the substantial evidence test. When findings of fact are challenged, the appellate court's consideration is limited to whether there is substantial evidence to support the findings. If such support is established, the findings will not be disturbed on appeal. *Maehren v. Seattle,* 92 Wn.2d 480, 486, 599 P.2d 1255 (1979); *Culinary Workers Local 596 Trust v. Gateway Cafe, Inc.,* 91 Wn.2d 353, 588 P.2d 1334 (1979). The reviewing court may not substitute its judgment for that of the trial court. *Maehren v. Seattle, supra; Lantis v. Pfarr,* 67 Wn.2d 994, 410 P.2d 900 (1966). Where the evidence is conflicting, the trier of fact may believe entirely the testimony of some of the witnesses and disbelieve entirely the testimony of others as well as draw from the evidence any reasonable inference fairly deducible therefrom. *Dempsey v. Joe Pignataro Chevrolet, Inc.,* 22 Wn. App. 384, 390, 589 P.2d 1265 (1979). This principle was also enunciated in *In re Sego,* 82 Wn.2d 736, 513 P.2d 831 (1973), where the court stated at pages 739–40:

> As an appellate tribunal, we are not entitled to weigh either the evidence or the credibility of witnesses even though we may disagree with the trial court in either regard. The trial court has the witnesses before it and is able to observe them and their demeanor upon the wit-

ness stand. It is more capable of resolving questions touching upon both weight and credibility than we are.

Here, the trial court exercised its discretion in determining and weighing the credibility of witnesses. At the posttrial presentment of findings, conclusions and judgment, the court stated:

THE COURT: I think someone testified seven to nine percent, but that really isn't the reason I find against Mr. Harding in this case. You know, my basic problem with Mr. Harding's testimony was that Mr. Harding had tremendous difficulty on the stand. I'm not saying the man is, you know, inherently dishonest or anything of that nature, but he had tremendous difficulty giving a straight answer to any question. He was off on a tangent at all times, and my impression of Mrs. Warren at the same time was that she was a lady who was selling property, would be looking for the top price and the top dollar price, and interest–wise, and so that is how I came out to the conclusion I did.

. . .

THE COURT: Well, I think, Mr. Cooper, the reason I came to that conclusion primarily, as I have indicated before, was that Mr. Harding had just the greatest difficulty giving a direct answer to anything. The man seemed prone to get off on a tangent immediately.

MR. COOPER: You have to remember he is a farm boy and he is out selling real estate.

THE COURT: Sophisticated, hard–selling realtor, too.

The court's finding of fact No. 7 provided in pertinent part that "at the time the going rate of interest was 7 percent to 9 percent on contracts". This finding was supported by the testimony of Harding and Mr. Lienwebber, another realtor. Even though we might have reached a different result, there was sufficient evidence presented at trial to support the court's findings and conclusions, and we cannot change the findings.

Finally, Harding contends the Warrens acted in bad faith by rejecting the Reavis offer and refusing to negotiate the terms of the offer. Harding quotes from *Smick v. Pierson,* 18 Wn. App. 75, 78, 566 P.2d 580 (1977), where this court set out the general rules governing a broker's right to

recover a commission:

> It is the general rule that a broker is entitled to his commission when he produces a purchaser who is *ready, able, and willing to purchase upon the terms required. . . .*
> The rule applies even though the sale is not consummated by the owner or is consummated by him upon terms different from those stipulated in the brokerage agreement[,]

quoting from *Bloom v. Christensen,* 18 Wn.2d 137, 142, 138 P.2d 655 (1943).

 In *Smick,* the plaintiff real estate broker found a potential purchaser, Mr. Miller. Miller submitted several offers to the sellers. Each was rejected due to the size of the installment payments. The listing agreement provided that installments would be payable upon "terms to be negotiated". No definitive agreement for a purchase and sale was reached although Miller testified at trial that he would have been agreeable to purchase on any terms or for cash. When the listing agreement expired and no sale had been consummated, the broker brought suit to recover his commission. The court denied the broker's recovery, holding that since the terms of sale in the listing agreement were incomplete, it was necessary that an agreement for the purchase and sale be reached between the parties before plaintiff was entitled to recover a commission. Here, the only difference is that the listing agreement did not specifically state "terms to be negotiated". Rather, as the trial court found, the contract was ambiguous and therefore extrinsic evidence was admitted that the Warrens understood the interest rate to be open and negotiable. Therefore, applying the *Smick* rule, Reavis and the Warrens had to reach an agreement for the purchase and sale of the Warren farm before Harding would be entitled to a commission.

Harding cites no authority which would impose a duty on the sellers to negotiate terms with prospective buyers. Rather, in *Smick v. Pierson, supra* at 78, this court adopted Restatement (Second) of Agency § 445, comment *d* (1958),

which states:

> When the principal has furnished the broker with only part of the terms, with the understanding that further details are subject to negotiation between the principal and the customer, *the principal, unless acting in bad faith . . . is free to terminate such negotiations without liability to the broker.* The principal's promise to pay the broker a commission does not become binding unless the principal and the customer reach a present definitive oral or written agreement.

(Italics ours.) Thus, the Warrens were free to refuse to negotiate.

The cases relied upon by Harding are not in point. In *Weaver v. Fairbanks,* 10 Wn. App. 688, 519 P.2d 1403 (1974), there was an earnest money agreement, but the sale was never consummated because the buyer was unable to obtain FHA financing when the seller refused to undertake repairs required by FHA. The court held both parties had a good faith obligation to meet the condition precedent to sale of the property and awarded the broker his commission. Here, there is no earnest money agreement, only a listing agreement which imposes no such duty to negotiate. Therefore, the trial court did not have to make a specific conclusion of law concerning the Warrens' duty to negotiate.

The only evidence of bad faith presented at trial was the testimony of Harding himself. He testified the Warrens refused to meet with him to discuss offers Harding had received, that they failed to inform him of their objection to the 7 percent rate contained in the offers, that a much needed rainfall caused the Warrens to decide to keep that year's crop rather than sell it with the farm as stated in the listing agreement, and that the Warrens decided they wanted a tax–free exchange of property rather than a contract of purchase. Mrs. Warren's testimony, however, sharply disputed Harding's. Since the trial court was the sole judge of the witness' credibility, it could properly believe Mrs. Warren's testimony and disbelieve Harding's, thereby determining that the Warrens did not act in bad

faith. From that factual finding, it follows that the Warrens rightfully rejected an offer which was not in conformity with the listing agreement. Therefore, the trial court granted judgment in favor of the Warrens, which we will not disturb.

We affirm.

GREEN and MUNSON, JJ., concur.